# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHIRLEY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-3830 (ABJ) |
| | ) | |
| UNITED AMERICAN | ) | |
| SECURITY, LLC | ) | |
| *doing business as* GARDAWORLD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Defendant United American Security, LLC ("United") is a private company that offers a range of security services to its clients. Pl.'s Statement of Undisputed Material Facts [Dkt. # 13-1] ("Pl.'s SUMF") ¶ 1. United was acquired by a separate company, GardaWorld, in 2018, and it does business in the District of Columbia under that name.[1] Pl.'s Mot. for Partial Summ. J. [Dkt. # 13] ("Pl.'s Mot.") at 1. Plaintiff Shirley Williams began working for GardaWorld in 2016 and was stationed at Farragut Center, a building located at 1725 I Street NW. Pl.'s SUMF ¶¶ 12–13.

Farragut Center contracted with GardaWorld "to perform lobby attendant services at the Property," which included, among other things, "addressing alarms and suspicious activities; controlling access to the building; calling local authorities when necessary; monitoring the

---

[1] For purposes of this opinion, the Court will refer to defendant as "GardaWorld" even though plaintiff's employment with United American Security, LLC precedes its acquisition by GardaWorld.

'removal of any property or documents' from the building; cooperating with law enforcement agencies during criminal investigations and maintaining crime scenes to 'protect possible evidence;' addressing fires, accidents, internal disorders, and attempts of sabotage; and issuing daily reports." *Id.* ¶¶ 14–15; *see also* Ex. D to Pl.'s Mot. for Partial Summ. J. [Dkt # 13-5].  As a GardaWorld lobby attendant at the property, plaintiff was responsible for fulfilling these duties. Pl.'s SUMF ¶ 15.

In February 2023, plaintiff expressed an interest in obtaining the certification to become a "security officer," which would entitle her to higher hourly pay.  Def.'s Response to Pl.'s SUMF [Dkt. # 14-1] ("Def.'s SUMF") ¶ D89.  To that end, plaintiff worked with GardaWorld to prepare and submit a security officer certification application to the D.C. Department of Licensing and Consumer Protection so that she could assume that role with the company in the future.  Pl.'s SUMF ¶ 56; *see also* Def.'s SUMF ¶¶ D90–D97.  Plaintiff obtained her certification in March 2024, and defendant temporarily stationed her that month at 900 G Street NW to determine whether she was "a good fit" and could "perform the necessary duties" of a security officer.  Def.'s SUMF ¶¶ D95, D98–99.

As at Farragut Center, plaintiff's employment at 900 G Street NW was governed by a set of post orders outlining her duties, but this time, those orders additionally required plaintiff to "limit[] access to the building" and remove unwelcome individuals – potentially by force, if necessary.  Def.'s SUMF ¶¶ D101–D104.  Plaintiff completed only two shifts at 900 G Street; despite the role's higher wage, plaintiff rejected permanent reassignment to the building because of personal objections to the way affairs were managed at that location.  *See id.* ¶¶ D99, D105. Plaintiff opted instead for a role as a "Lower-Level Security Booth Professional" at 1200 New

Hampshire Avenue NW (the "Al Jazeera Building"), *id.* ¶ D107, where she has been employed since March 2024.  Pl.'s SUMF ¶ 13; Def.'s SUMF ¶¶ D95, D106.

Plaintiff originally brought this action in the Superior Court of the District of Columbia. In short, she alleges that defendant has "failed to pay [her] the correct D.C. minimum and overtime wages for a security officer who works in an office building."  Compl. [Dkt. # 1-1] ¶ 1.  Defendant removed the case to this Court, *see* Notice of Removal [Dkt. # 1] at 1, and it answered the complaint on January 2, 2024.  *See* Def.'s Answer to Pl.'s Compl. [Dkt. # 4].  The parties have concluded discovery and filed cross-motions for partial summary judgment, focused on whether plaintiff qualifies as a "security officer" and is entitled to higher wages under District of Columbia law.  Pl.'s Mot. at 1; Def.'s Mot. for Summ. J. [Dkt. # 14] ("Def.'s Cross-Mot.") at 1.

For the reasons stated below, plaintiff's motion for partial summary judgment will be **GRANTED IN PART** and **DENIED IN PART**, and defendant's motion for partial summary judgment will be **GRANTED IN PART** and **DENIED IN PART.**

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable factfinder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

A.    **Plaintiff Was Not Operating as a "Security Officer" Under District of Columbia Law Prior to Her Certification and Licensure.**

Title 32, Chapter 10 of the D.C. Code ("Minimum Wage Act") governs minimum wages in the District of Columbia, including what types of employees are covered, the wage required for each category, and the administrative and civil remedies available to aggrieved employees. D.C. Code § 32-1001 *et seq.* District law requires that employers "pay a security officer working in an office building in the District of Columbia wages, or any combination of wages and benefits, that are not less than . . . the guard 1 classification established" under federal law. D.C. Code § 32-

4

1003(h).[2]  However, Chapter 10 does not itself define the term "security officer."  *See* D.C. Code § 32-1001 *et seq.*  Instead, it provides:  "The term 'security officer' shall have the same meaning as provided in section 2100 of Title 17 of the District of Columbia Municipal Regulations."  D.C. Code § 32-1002(7A).

That section of the Municipal Regulations governs the eligibility for and certification of security officers in the District.  *See* D.C. Mun. Regs. ("DCMR") tit. 17, § 2100 *et seq.*  As relevant here, the general provisions of the regulations state:

> For purposes of this chapter, the term "security officer" means any person privately employed to do any of the following:
>
> (a) Prevent the theft, misappropriation, or concealment of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles;
>
> (b) Prevent damage to real or personal property;
>
> (c) Prevent assaults, gate-crashing, or other disorders at meetings, events, or performances; or
>
> (d) Prevent similar illegal occurrences.

DCMR tit. 17, § 2100.1.  The regulations then separately define classes of individuals that are included or excluded from the definition of "security officers," and section 17-2100.2 specifically includes "[u]niformed individuals employed by a security agency or other employer for any of the purposes" set forth in the preceding subsection.  DCMR tit. 17, § 2100.1–2100.2.

Plaintiff argues that she has been operating as a "security officer" for defendant since she was first hired by GardaWorld in 2016 because at each of the three posts she performed and still

---

[2]    According to plaintiff, that amount was $21.82 per hour from July 1, 2020, to June 30, 2022; $ 21.66 per hour from July 1, 2022, to June 30, 2023; and $24.19 per hour from July 1, 2023, through June 30, 2024.  Compl. ¶ 38.

performs the duties identified in § 17-2001.1. Pl.'s Mot. at 11–12. She therefore argues that she has been entitled to a greater amount in compensation than what she has historically been paid. *Id.* Defendant disputes that plaintiff performs those duties, Def.'s Cross-Mot. at 18, but it also argues that plaintiff's previous failure to meet certain regulatory prerequisites – principally involving certification and training – means that, at least prior to her certification, she would not have been entitled to the increased wages in any event. *Id.* at 15–17. The Court will focus its opinion on this latter question of statutory interpretation.

While courts have not had occasion to comment on the specific interpretive issue presented in this case, there are well-established principles of statutory interpretation involving the scope of cross-references between statutes. For example, in *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 583 U.S. 416 (2018), shareholders of Cyan, a corporation, brought a class action claiming that the company made material misstatements in its initial public offering in violation of the Securities Act of 1933. *Id.* at 425. Section 77v of that Act provides federal courts with jurisdiction over such suits, "except as provided in [section 77p]" – a provision known as the Securities Litigation Uniform Standards Act ("SLUSA"). 15 U.S.C. § 77v; *Cyan, Inc.*, 583 U.S. at 420. Section 77p(f)(2) defines what kinds of actions are precluded under SLUSA. 15 U.S.C. § 77p(f)(2). When read in context with the entirety of section 77p, this definition is clearly meant to refer only to class actions arising exclusively under state law; however, when interpreted in isolation, no such distinction is evident, and it could be read to apply to both federal and state law claims alike. *Id.* Cyan preferred the isolated reading and argued that section 77p(f)(2) precluded *all* class actions that meet its definitional standards, regardless of whether they arise under state or federal law. *Cyan*, 583 U.S. at 427.

The Supreme Court rejected this argument as improper when read in conjunction with SLUSA's other provisions.  In particular, the Court noted:

> [T]he except clause points to 'section 77p' as a whole – not to paragraph 77p(f)(2).  Cyan wants to cherry pick from the material covered by the statutory cross-reference.  But if Congress had intended to refer to the definition in §77p(f)(2) alone, it presumably would have done so – just by adding a letter, a number, and a few parentheticals . . . Congress often drafts statutes with hierarchical schemes – section, subsection, paragraph, and on down the line.' . . . And '[w]hen Congress want[s] to refer only to a particular subsection or paragraph, it sa[ys] so.'

*Cyan*, 583 U.S. at 428, quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017).

With that, the Supreme Court in *Cyan* rejected the kind of argument that plaintiff makes here.  Plaintiff asserts that the Minimum Wage Act's cross-reference to "section 2100" is in fact meant to refer only to section 2100.1, which merely defines the duties of "security officers" in the District of Columbia.  Pl.'s Mot. at 17–18.  But the *Cyan* Court's reasoning is applicable here:  if the D.C. Council meant to reference only section 2100.1, it would have said so.  The fact that it did not, and instead referred to section 2100 of the chapter in its entirety, means that it intended that the entire section would give meaning to the use of the term in the Minimum Wage Act – including not only the duties of a "security officer" contained in section 2100.1, but also the regulatory provisions attending that definition found elsewhere in the same chapter.  D.C. Code § 32-1002(7A).

This poses a problem for plaintiff.  In the abstract, it makes sense that an individual who walks like a security officer, dresses like a security officer, and acts like a security officer is to be compensated as . . . well, a security officer.  But that is not the regulatory regime that the D.C. Council has constructed.

The Enhanced Professional Security Amendment Act of 2006, D.C. Law 16-187, became effective in the District of Columbia in November 2006.  That "legislation, in part, created

minimum training standards for security officers benefiting residents, workers, visitors, and private security personnel with the ultimate goal of improving public safety." D.C. Comm. Rep., B. 17-199 (Nov. 13, 2007) at 1. However, the Council quickly encountered a roadblock to achieving its goal: high turnover among security officers. *Id.* To rectify this issue, the D.C. Council passed the Enhanced Professional Security Amended Act of 2008, D.C. Law 17-114, which amended the Minimum Wage Act Revision Act of 1992, D.C. Law 9-248; D.C. Code § 32-1001 *et seq.*, to establish the higher wages plaintiff claims are owed in this case.

Plaintiff essentially asks the Court to read the two laws in isolation, such that the minimum wage standards governing security officers are treated separately from the training and certification requirements of the profession. But to do so would undermine the scheme that the D.C. Council established, through which the government exercises some control over the training and certification of security officers and guarantees those properly certified a wage higher than the prevailing minimum. That the two laws are meant to be read together is evident in the regulations themselves: the provision cited in the Minimum Wage Act – DCMR § 2100 – not only defines "security officer" but also establishes that an officer's "certification" is valid for two years. *See* DCMR tit. 17, § 2100.4. And a "certification" is defined as "[t]he permission that *must be granted* by the Mayor *before* a person can lawfully be employed as a security officer in the District of Columbia." *Id.* § 2199.1 (emphasis added). It simply cannot be the case that an individual not yet certified to perform the duties of a "security officer" (at least under District of Columbia law) would be entitled to the wages attending that regulated profession.

Here, it is undisputed that plaintiff did not satisfy the regulatory prerequisite of certification until March 2024, when she obtained her license to operate as a security officer. *See* Def.'s SUMF ¶ D95. As a result, even if the Court were to agree with plaintiff that she performed

"security officer"-like duties at each of her posts between 2016 and that time, the Court cannot find that she was operating as a security officer for purposes of the Minimum Wage Act until she was certified. The Court will therefore deny plaintiff's motion for partial summary judgment and grant defendant's motion for summary judgment, insofar as plaintiff's claims are predicated on work performed prior to her licensure as a security officer in March 2024.[3]

**B.    Plaintiff's Duties at the Al Jazeera Building Qualify Her as a "Security Officer" as a Matter of Law.**

As described above, an individual's classification as a "security officer" is a combination of proper credentialing and employment to perform any number of statutorily defined duties: "the term 'security officer' means any person privately employed to do any of the following: (a) [p]revent the theft, misappropriation, or concealment of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles; (b) [p]revent damage to real or personal property; (c) [p]revent assaults, gate-crashing, or other disorders at meetings, events, or performances; or (d) [p]revent similar illegal occurrences." DCMR tit. 17, § 2100.1.

---

3    The Court notes a legitimate policy matter raised by plaintiff. She argues that defendant and similarly situated companies could hire people to perform "security officer" duties (as defined by the Municipal Regulations) yet evade the obligation of paying "security officer" wages (as defined by the Minimum Wage Act) by failing to initiate or facilitate the processes by which such employees could be brought into compliance with the regulatory framework. *See* Pl.'s Mot. at 19. As plaintiff notes, the employing security company "controls virtually every aspect of the licensing process – from submitting applications and providing training to dictating uniform specifications and requesting licensure." *Id.* Plaintiff therefore reasonably asserts that the security agencies can "exploit technicalities and evade their obligation to pay their workers the higher wage mandated by law." *Id.* That concern is valid, but it is not manifest in this case. Indeed, it is clear from the record that defendant promptly assisted plaintiff in obtaining her certification when she expressed interest in doing so. *See* Pl.'s SUMF ¶ 56; *see also* Def.'s SUMF ¶¶ D90–D97. Moreover, the Court lacks the power to rewrite the statute to solve any defects plaintiff has identified; that is an issue for the legislature.

Plaintiff has been employed as a "Lower-Level Security Booth Professional" through GardaWorld at the Al Jazeera Building since March 2024. Pl.'s SUMF ¶ 13; Def.'s SUMF ¶¶ D95, D106. The post orders for the Al Jazeera Building define the duties of a "lower-level security booth professional" as follows:

> (1) Provide excellent customer service; (2) Monitor CCTV and emails; (3) Complete any specific tasks/job duties assigned by your client and direct manager; (4) Remain visible, alert, and aware while on post for your shift. Only stepping away when properly relieved or given permission by property management; (5) Report any tenant concerns to property management immediately; (6) Complete detailed incident reports as needed. All incident reports are to be submitted the same day/shift as the incident; (7) Monitor the loading dock, lobby activity, roundabout traffic, parking, and garages; (8) Complete Daily Activity Log throughout your shift; (9) Respond to emergencies, alarms, propped doors, trespassers, panhandlers and any client needs as requested; (10) Conduct periodic tours every 2 hours.

Def.'s SUMF ¶ D108 (internal quotation marks omitted); *see also* Post Orders – Al Jazeera 1200 New Hampshire Ave NW, Ex. H to Pl.'s Mot. [Dkt. # 13-9] ("Al Jazeera Post Orders") at 2. The parties agree that plaintiff's duties are generally to "monitor tenant traffic, close propped doors, watch CCTV and make sure 'nothing strange is going on.'" Def.'s SUMF ¶ D111, quoting Pl. Shirley Williams' Dep. Tr., Ex. 11 to Decl. of Adam Calandra. [Dkt. # 18-11] at 120:22-126:15.

The parties disagree, however, whether plaintiff has employed to "prevent" crime at the Al Jazeera Building. *Compare* Def's SUMF ¶ D121 ("Plaintiff was not employed to prevent any crimes.") *with* Pl.'s Resp. to Def.'s SUMF [Dkt. # 21-1] ¶ D121 (disputing defendant's characterization). For example, defendant points out that plaintiff "has not prepared an [incident] report, responded to an emergency, dealt with a trespasser, panhandler, smoke alarm, or sprinkler," nor has she had to "call[] law enforcement, identify suspicious activity, cooperate with law enforcement, maintain the scene of a crime, provide assistance in a fight, stop a sabotage attempt, or other criminal activity." Def.'s SUMF ¶ D113. Plaintiff disagrees with defendant's

characterization of her activities "to the extent preventing and writing up individuals who attempt to evade scanning their entry in the building does not constitute identifying suspicious activity; and to the extent that 'stopping' sabotage or crime does not include 'preventing' or reducing the risk [of] by maintaining control over the rear access of a building."  Pl.'s Resp. to Def.'s SUMF ¶ D113.

The Court agrees with plaintiff and finds that, as a matter of law, she has been operating as a "security officer" within the meaning of the Minimum Wage Act during her time at the Al Jazeera Building.  The Minimum Wage Act and the relevant Municipal Regulations, on their face, do not require that an individual actually perform any of the statutorily defined duties, only that an individual be "employed" to do so.  *See* D.C. Code § 32-1003(h); DCMR tit. 17, § 2100.1.  And here, while defendant emphasizes that plaintiff has not in fact had to confront individuals suspected of criminal activity, it is undisputed that the post orders for the Al Jazeera building expressly require plaintiff to "[r]espond to emergencies, alarms, propped doors, trespassers, panhandlers and any client needs as requested."  Al Jazeera Post Orders at 2.  Trespassing is a crime in the District of Columbia.  *See* D.C. Code § 22-3302 (defining misdemeanor crime of unlawful entry on property).  Plaintiff's employment therefore falls squarely within the definition of "security

officer," as she has been employed to "[p]revent . . . illegal occurrences" that are "similar" to those identified in the regulations, like "gate-crashing."  DCMR tit. 17, § 2100.1.[4]

## CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** plaintiff's motion for partial summary judgment and **GRANT IN PART** and **DENY IN PART** defendant's motion for summary judgment.  Summary judgment will be granted for defendant with respect to plaintiff's claims in Counts I and II of the complaint for the period of time between the commencement of her employment until her licensure and posting at the Al Jazeera Building. Summary judgment will be granted for plaintiff in Counts I and II of the complaint for the period of time beginning with her employment at the Al Jazeera Building.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: June 26, 2025

---

[4]      Defendant also argues that summary judgment must be granted in its favor because plaintiff does not work "in an office building," D.C. Code. § 32-1003(h), as required by the Minimum Wage Act.  *See* Def.'s Cross-Mot. at 23 n.21.  The Minimum Wage Act defines an "office building" as "any commercial property where the primary functions are the transaction of administrative, business, civic, or professional services, including properties where handling goods, wares, or merchandise, in limited quantities, is accessory to the primary occupancy or use." D.C. Code. § 32-1002(6A).  Defendant maintains that because "Al Jazeera operates a private news station within a single unit that they rent within the building, which is not accessible to the public," the Al Jazeera site "does not fall within the definition of 'office building.'"  Def.'s Cross-Mot. at 23 & n.21.  The Court is unpersuaded by this argument.  The Minimum Wage Act does not require that security officers work "for" an office building but "in" an office building; to suggest that plaintiff's posting within an interior component of a larger commercial building somehow renders her "outside" that building strains credulity.